**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| NETLIST, INC.<br><br>    Plaintiff,<br><br>  v.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br>SAMSUNG ELECTRONICS AMERICA,<br>INC., SAMSUNG SEMICONDUCTOR,<br>INC., AVNET, INC.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 2:26-cv-553<br><br>)  JURY TRIAL DEMANDED<br>) |

---

## COMPLAINT

---

1.      Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, brings this Complaint against Defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Semiconductor, Inc. ("SSI" and, collectively with SEC and SEA, "Samsung"), and Avnet, Inc. ("Avnet" and, together with Samsung, "Defendants") for Defendants' infringement of U.S. Patent No. 12,675,407 ("the '407 Patent").  In addition, Netlist seeks a declaration that it has not breached any contractual obligation to Samsung, including obligations to license the '407 Patent to Samsung and its affiliates on reasonable and nondiscriminatory ("RAND") terms, or violated federal or state competition laws, including Section 2 of the Sherman Antitrust Act and California's Unfair Competition Law.

## I.      THE PARTIES

2.      Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Way, Suite 100, Irvine, CA 92617.

3.      On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi-Do, 443-742, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this Complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

4.      On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  SEA is a wholly owned subsidiary of SEC.

5.      On information and belief, SSI is a corporation organized and existing under the laws of the State of California.  On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  Defendant SSI may be served with process through its registered agent for service in Texas: National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.  On information and belief, SSI is a wholly owned subsidiary of SEA.  *See Samsung*

*Electronics Co., Ltd., v. Netlist, Inc.*, No. 1:25-cv-626 (D. Del.), Dkt. 5 (Samsung's corporate disclosure statement providing that "SSI is a wholly-owned subsidiary of SEA").

6.      On information and belief, Avnet is a corporation organized and existing under the laws of the State of New York.  On information and belief, Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, Avnet has a regular and established place of business at 3101 E. President George Bush Highway, Suite 250, Richardson, Texas 75082.  On information and belief, Avnet is registered with the Texas Secretary of State to do business in Texas.  On information and belief, Avnet can be served through its registered agent: The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218.

7.      On information and belief, Defendants have used, sold, or offered to sell products and services, including the Accused Instrumentalities, in this judicial district.

## II.      <u>JURISDICTION AND VENUE</u>

8.      Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*), and the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), under the Sherman Antitrust Act (15 U.S.C. § 2).  This Court has subject matter jurisdiction over Netlist's claims alleged in this action at least under 28 U.S.C. §§ 1331, 1338, and 2201(a).  Additionally, supplemental jurisdiction pursuant to 28 U.S.C. § 1367 is appropriate here over the Second and Fifth Claims for declaratory relief based on the common nucleus of operating facts forming the same case or controversy as the declaratory judgment claims based on Section 2 of the Sherman Act, 15 U.S.C. § 2 in Claims Three and Four. Indeed, under Samsung's repeated view, supplemental jurisdiction under 28 U.S.C. § 1367 exists over its own breach of contract claim when paired with a declaratory judgment claim of non-infringement of the same patent.  *See Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:21-cv-1453

(D. Del.), D.I. 1, ¶ 8 ("The breach of contract claim forms part of the same case or controversy as the claims for declaratory judgment of non-infringement and unenforceability asserted by Samsung in this action."); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 23-1122 (D. Del.), D.I. 1, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 24-614 (D. Del.), D.I. 15, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-1371 (D. Del.), D.I. 1, ¶ 9 (same).  Thus, to the extent Samsung is correct, then this Court has supplemental jurisdiction over the breach of contract declaratory judgment claim.

9.       Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

10.      Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the '407 Patent.  Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce, both directly and through intermediaries (including distributors, retailers, authorized dealers, sales agents, and other individuals or entities), knowing or understanding that such products would be sold and used in the United States, including in this District.  Moreover, Samsung has admitted that its other similar breach of contract claims arise directly out of Netlist's "assertions of patents." *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1589 (D. Del.), D.I. 10-1, ¶ 19; *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1, ¶ 2.  Samsung specifically points to Netlist's assertions in the Eastern District of Texas for its own breach of contract claims.  C.A. No.

1:25-cv-1589, ¶¶ 205, 212; C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1, ¶ 118.  This District and Texas are thus intertwined with this dispute between Netlist and Samsung.  And Samsung purposefully availed itself of the protections of the laws of Texas and within this District by participating in those lawsuits underlying its breach of contract claims.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).  Generally, venue is also proper in this District under 28 U.S.C. § 1391(b)–(c) because Defendants are all subject to personal jurisdiction in this District.  In addition, under Section 1391(b)(3), Samsung has taken the position that there is no venue where "all necessary parties" can all be sued together for infringement, and that SSI, SEA, and Netlist are all indispensable. *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-626 (D. Del.), D.I. 15 at 1-2, 9-10.  Venue is also proper for Samsung because Samsung maintains a regular and established place of business in this District.  For instance, SEC maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  As another example, SEA maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  Venue is also proper for SSI because it maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

12.     Samsung has attempted to contest venue in this District in a recent patent infringement case involving Samsung's DDR5 DIMM products, but despite refusing Netlist's attempts to engage in venue discovery, Samsung's motion disputing venue was rendered moot before that case was stayed.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:25-cv-00557, Dkts. 160, 166 (E.D. Tex. Mar. 2, 2026); *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:25-cv-00748, Dkts. 81, 92 (E.D. Tex. Mar. 2, 2026).  Prior to that, Samsung did not contest venue in

multiple actions between the parties in this District.  *See Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-463 (E.D. Tex.) ("*Samsung I*" or "*EDTX I*"), *Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-293 (E.D. Tex.) ("*Samsung II*" or "*EDTX II*").  To the extent that SEA alleges it has no involvement with the Accused Instrumentalities and therefore has not committed acts of infringement within this Eastern District of Texas under Section 1400(b), a jury has already found that SEA infringed U.S. Patent Nos. 11,016,918 ("the '918 Patent") and 11,232,054 ("the '054 Patent") based on its DDR5 products.  On information and belief and to the extent SSI alleges that 6625 Excellence Way, Plano, Texas 75023 is not its regular and established place of business under Section 1400(b), SSI (along with SEC) has ratified this location as a regular and established place of business and, in addition, SEC, SSI, and SEA have sufficiently disregarded corporate formalities or work so closely together to treat them as one for venue purposes.  For instance, Samsung has a unified website for SEC, SSI, and SEA, and uses common signage on the building at 6625 Excellence Way that does not differentiate between SEC, SSI, and SEA.  And on June 2, 2026, Samsung cemented its roots in this District, announcing that its Plano, Texas location will soon be the site of its U.S. headquarters: "[W]e are relocating our U.S. headquarters from New Jersey to our existing campus in Plano, Texas, building on our 30-year presence in the state. The transition, which will be completed by the end of the year, is intended to strengthen alignment across teams and offices, and sharpen our focus on the areas that will drive the greatest impact for our customers, partners and business."[1]  Moreover, on information and belief, Samsung has a close, contractual relationship with its distributor and agent, Avnet, located within this District at 3101 E. President George Bush Highway, Suite 250, Richardson, Texas 75082, also with sufficient interim control and agency to support patent venue.

---

[1] Sasha Richie, *Samsung Moving U.S. Headquarters to Dallas*, The Dallas Morning News (June 2, 2026), https://www.dallasnews.com/business/technology/article/samsung-moving-u-s-headquarters-plano-22288252.php.

13.    Venue is also proper for Avnet because it maintains a regular and established place of business in this judicial district at 3101 E. President George Bush Highway, Suite 250, Richardson, Texas 75082 and has committed acts of infringement in this judicial district. Specifically, Avnet offers for sale and distributes its products, including the Accused Instrumentalities supplied by Samsung, all throughout the United States, including the State of Texas and the Eastern District of Texas.  Avnet's website, https://www.avnet.com/americas/, has an (800) contact number that prospective customers can call to obtain more information or a quote for the Accused Instrumentalities (and other products).  Avnet's website also specifically targets customers in Texas, including those in the Eastern District of Texas, by providing region-specific email contact, including dallas@avnet.com.[2]

14.    Therefore, Samsung, together with Avnet as the distributor of the Accused Instrumentalities, have offered to sell, have sold, and have intentionally and voluntarily placed infringing products into the stream of commerce with the expectation and understanding that those products will be sold, purchased, and/or used by its customers in the State of Texas, including the Eastern District of Texas.

## III.    FACTUAL ALLEGATIONS

### A.    Background

15.    Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies.  Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets.  Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time.  These capabilities will become increasingly valuable

---

[2] *Locations: Avnet Americas*, Avnet, https://www.avnet.com/americas/about-avnet/locations/ (last visited July 3, 2026).

as the volume of data being processed continues to exponentially increase. Netlist has secured multiple jury verdicts confirming the commercial success of its inventions. For example, in 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages. *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:21-cv-463, Dkt. 479. As another example, in 2024, a jury in the Eastern District of Texas awarded Netlist $445 million in damages against Micron, another dominant memory module manufacturer. *See Netlist, Inc. v. Micron Technology Texas, LLC*, No. 2:22-cv-294, Dkt. 135. And in November 2024, a jury in the Eastern District of Texas found that Samsung willfully infringed three other Netlist patents and awarded Netlist $118 million in damages. *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

16. Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LRDIMM"), HyperCloud®, based on Netlist's distributed buffer architecture. This technology was later adopted by the industry for DDR4 LRDIMMs, the predominant high-end server memory module for the past several years. The same architecture and patented local synchronization technology are also used in accused DDR5 products such as DDR5 RDIMMs (*i.e.*, registered dual in-line memory modules) and DDR5 MRDIMMs (*i.e.*, multiplexed rank dual in-line memory modules, also referred to as "MCRDIMMs"). Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM. Netlist's pioneering NVDIMM products utilized the same on-module power management technology found on newer-generation DDR5 DIMMs. These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

17.     In many commercial products, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs). The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system.  A memory module is typically installed into a memory slot on a computer motherboard.

18.     Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.  Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, MRDIMM, LRDIMM).

**B.      The '407 Patent**

19.     The '407 Patent is entitled "Memory Module with Local Synchronization," and was filed as U.S. Application No. 18/935,410 ("the '410 Application") on November 1, 2024 and assigned to Netlist, Inc.  The '407 Patent issued on July 7, 2026, and claims priority to, among others, U.S. Application No. 18/059,958, filed November 29, 2022, now U.S. Patent No. 12,135,644 ("the '644 Patent"); U.S. Application No. 17/141,978, filed January 5, 2021, now U.S. Patent. No. 11,513,955 ("the '955 Patent"); U.S. Application No. 16/432,700, filed June 5, 2019, now U.S. Patent No. 10,884,923 ("the '923 Patent"); U.S. Application No. 14/445,035, filed July 28, 2014, now U.S. Patent No. 10,324,841 ("the '841 Patent"); and U.S. Provisional No. 61/859,215 filed July 27, 2013.

20.     Claim 1 of the '407 Patent provides:

[1.pre] A memory module operable in a computer system having a memory controller and a system bus, the system bus including one or more clock signal lines, control/address (C/A) signal lines and data signal lines, the memory module comprising:

[1.a] a printed circuit board (PCB) having connectors configured to provide electrical connections between the memory module and the system bus;

**[1.b]** memory devices mounted on the PCB and organized in a plurality of groups, wherein a respective group of the memory devices is configurable to communicate data with the memory controller via a corresponding subset of the data signal lines;

**[1.c]** circuitry mounted on the PCB and configurable to:

**[1.c.1]** receive from the memory controller a system clock via the one or more clock signal lines and input control and address (C/A) signals via the C/A signal lines;

**[1.c.2]** generate module C/A signals in response to the input C/A signals;

**[1.c.3]** generate a plurality of local clocks corresponding, respectively, to the plurality of groups of the memory devices, the plurality of local clocks having respective phase relationships with the system clock, the respective phase relationships being programmable independently of each other; and

**[1.c.4]** output the module C/A signals to the memory devices; and

**[1.c.5]** output the plurality of local clocks to the memory devices, wherein a respective local clock having a respective programmable phase relationship with the system clock is output to a corresponding group of the memory devices and not to any other group of the memory devices, wherein the corresponding group of the memory devices is configurable to perform memory read or write operations by communicating data signals with the memory controller via a corresponding subset of data signal lines in accordance with the respective local clock.

### C.     Defendants' Infringing Activities

21.     Samsung is a global technology company and one of the largest manufacturers of semiconductor memory products such as DRAM and NAND Flash used in DDR5 DIMM products.  Samsung develops, manufactures, sells, offers to sell, and imports into the United States memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.

22.     Samsung and Netlist were initially partners under a 2015 Joint Development and License Agreement ("JDLA"), which granted Samsung a 5-year paid-up license to Netlist's patents "having an effective first filing date on or prior to" November 12, 2020.  *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 186 at 20-21 (C.D. Cal. Oct. 14, 2021).  On information and belief, Samsung used Netlist's technologies to develop products both in the mature markets such as DDR4 memory modules and the emerging market for new generations of DRAM technologies, including DDR5 and HBMs.  Under the JDLA, Samsung was obligated to supply Netlist certain memory products at competitive prices.  Samsung, however, did not honor its promises and repeatedly failed to fulfill Netlist's product orders.  As a result, Netlist terminated the JDLA on July 15, 2020, which termination was found effective on summary judgment by a federal district court in the Central District of California on October 14, 2021.  *Id.*

23.     Samsung appealed this decision, and the Ninth Circuit partially reversed the summary judgment ruling.  Following remand, the contract action in C.D. Cal. proceeded to a jury trial.  On May 17, 2024, the jury returned a verdict finding that Netlist's interpretation of the JDLA's supply provision was correct, and Samsung's breach of that provision was material.  On December 26, 2024, the Court granted Samsung's motion for a new trial, and a new trial was held on March 18–21, 2025.  On March 24, 2025, the jury returned a verdict for Netlist.  As a result of this jury verdict, Samsung's license to Netlist's patents was terminated on July 15, 2020.

24.     In April 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages, including $147,225,000 for the '918 and '054 Patents—asserted against Samsung's DDR5 memory modules.  And in November 2024, a jury found that Samsung willfully infringed three different Netlist patents and awarded Netlist $118 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

25.     Avnet "is one of the largest distributors of electronic components, computer products and embedded technology."[3]   As an authorized distributor of Samsung memory products,[4] Avnet "accelerates its partners' success by connecting the world's leading technology suppliers with a broad base of customers by providing cost-effective, value-added services and solutions."[5]  Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.

26.     The Accused Instrumentalities include, without limitation, infringing DDR5 products (the "Accused DDR5 Products"), such as DDR5 RDIMMs and DDR5 MRDIMMs, and other products having materially the same structures and designs in relevant parts, that are made, sold, offered for sale, used and/or imported into the United States by Defendants.

27.     The Accused DDR5 Products include, without limitation, any DDR5 products made, sold, offered for sale, used and/or imported into the United States by Defendants comprising a module board, edge connections, circuitry, and a plurality of dynamic random-access memory (DRAM) devices, such as, for example, Samsung's products having part numbers M321R8GA0PB0-CWM, M321R8GA0BB0-CQK, and M321R4GA3BB6-CQK, which are currently listed for sale on Amazon.com.  *See Samsung 64GB DDR5 5600MHz PC5-44800 ECC RDIMM 2Rx4 (EC8 10x4) Dual Rank 1.1V Registered DIMM 288-Pin Server RAM Memory M321R8GA0PB0-CWM*, Amazon, https://www.amazon.com/Samsung-5600MHz-PC5-44800-Registered-M321R8GA0PB0-CWM/dp/B0D2LWZWFK (last visited July 2, 2026) [hereinafter, "Samsung M321R8GA0PB0-CWM"]:

---

[3] *Avnet, Inc. Names Rodney C. Adkins to Its Board of Directors*, SEC (June 15, 2015), https://www.sec.gov/Archives/edgar/data/8858/000129993315000942/exhibit1.htm.

[4] *Samsung*, Avnet, https://www.avnet.com/americas/manufacturers/m/samsung/ (last visited July 3, 2026).

[5] *Avnet, Inc. Names Rodney C. Adkins to Its Board of Directors*, *supra*.



(Samsung Part No. M321R8GA0PB0-CWM);

*Samsung 64GB DDR5 4800MHz PC5-38400 ECC RDIMM 2Rx4 (EC8 10x4) Dual Rank 1.1V Registered DIMM 288-Pin Server RAM Memory M321R8GA0BB0-CQK*, Amazon, https://www.amazon.com/Samsung-4800MHz-PC5-38400-Registered-M321R8GA0BB0-CQK/dp/B0CFG7THWM/ (last visited July 3, 2026) [hereinafter, "Samsung M321R8GA0BB0-CQK"]:





(Samsung Part No. M321R8GA0BB0-CQK);

*Samsung 32GB DDR5 4800MHz PC5-38400 ECC RDIMM 2Rx8 Dual Rank 1.1V Registered DIMM 288-Pin Server RAM Memory M321R4GA3BB6-CQK*, Amazon, https://www.amazon.com/Samsung-4800MHz-PC5-38400-Registered-M321R4GA3BB6-CQK/dp/B0CFG7F72M/ (last visited July 3, 2026) [hereinafter, "Samsung M321R4GA3BB6-CQK"]:



(Samsung Part No. M321R4GA3BB6-CQK).

28.    As further example, the Accused DDR5 Products include, without limitation, any Samsung DDR5 memory modules, such as, for example, the DDR5 RDIMM and DDR5 MRDIMM products depicted on Samsung's website.  *See Dram: DDR*, Samsung, https://semiconductor.samsung.com/dram/ddr/ (last visited July 3, 2026):



29.    As shown above, each of the DDR5 memory modules comprises a printed circuit board, edge connections through which the module communicates and exchanges data with the system memory controller, multiple groups of DRAM chips (*i.e.*, memory devices), and a registering clock driver ("RCD") or multiplexed registering clock driver ("MRCD").

30.    DDR5 memory modules introduced important upgrades over DDR4 modules to support massive bandwidth requirements and AI workloads, as well as to benefit from the reduced power consumption and enhanced reliability that DDR5 memory offers over its predecessors.

### D.    Compliance with Contract and Competition Law

31.    Samsung has a history of filing retaliatory litigation against Netlist alleging that Netlist's patents are standard essential ("SEPs") under JEDEC, and that Netlist has allegedly failed to license these patents on reasonable and non-discriminatory ("RAND") terms. Based on these allegations, Samsung has brought suit against Netlist for breach of contract, violations of Section 2 of the Sherman Antitrust Act, and violation of California's Unfair Competition Law ("UCL").

32.    On September 30, 2025, Netlist brought a complaint under Section 337 of the Tariff Act of 1930 against Samsung in the United States International Trade Commission ("USITC") alleging infringement of various Netlist patents.  *Certain Dynamic Random Access Memory (DRAM) Devices, Products Containing the Same, and Components Thereof,* Inv. No. 337-TA-1472 ("USITC Compl."). Netlist's complaint expressly alleged that the asserted patents were not

standard essential.  USITC Compl. ¶ 20 ("Netlist is not relying on essentiality to the standard to establish infringement by the proposed Respondents. In particular, the JEDEC standard does not require all limitations of any one of the Asserted Claims. Accordingly, none of the Asserted Claims is standard-essential.").

33.    Despite this, Samsung filed counterclaims, which it subsequently removed to the United States District Court for District of Delaware pursuant 19 U.S.C. § 1337(c) and 19 C.F.R. § 210,149(e), alleging the following: "Although Netlist asserts alleged SEPs in [the USITC] action, Netlist has not made a RAND offer, in violation of its RAND commitment to all JEDEC members. Through this and other conduct described in more detail below, Netlist has violated and/or attempted to violate Section 2 of the Sherman Act, breached its contractual obligations owed to Samsung, and engaged in unfair competition in violation of California Business and Professions Code § 17200 *et seq.*" *Samsung Electronics Co., LTD., v. Netlist, Inc.*, 1:25-cv-01589-UNA (D. Del., Dec. 31, 2025), Dkt. 1-1 ¶¶ 11-12.

34.    Samsung has unsuccessfully made similar arguments alleging the same facts previously before this Court.

35.    For example, Samsung asserted defenses of laches, estoppel, and/or waiver, and inequitable conduct, in Case Nos. 2:21-cv-00463 ("*EDTX I*") and 2:22-cv-00293 ("*EDTX II*") for Netlist's alleged noncompliance with RAND obligations and with JEDEC's disclosure obligations, and for Netlist's alleged failure to disclose JEDEC prior art in patent prosecution.  *See* Answer to First Am. Compl. at 39, 44–51, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. May 18, 2022), Dkt. No. 25; Answer to Third Am. Compl. at 22–23, 28–44, *EDTX II*, No. 2:22-cv-00293 (E.D. Tex. Sept. 11, 2023), Dkt. No. 145.

36.    The JEDEC Patent Policy obligates licensing only "Essential Patent Claims" on RAND terms.  JEDEC defines "Essential Patent Claims" as claims that "would necessarily be

infringed by" complying with "a final approved JEDEC standard." In other words, only patent claims that are actually essential to a JEDEC standard must be licensed on RAND terms.

37. Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential. *EDTX I*, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id.*, at 147:1-6 ("[The Court]: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *EDTX I*, Dkt. 550, at 25. Compliance with JEDEC standards is immaterial to Samsung's infringement of Netlist's patents.

38. Samsung has repeatedly claimed that the parents of the patent-in-suit are not standard essential. Samsung has repeatedly claimed that it does not infringe Netlist's parent patents through Samsung's design, manufacture, use, importation, offering for sale, and/or sales of certain semiconductor products including the Accused Instrumentalities and related products, which are JEDEC standard compliant, meaning there is no RAND obligation if the parent patents are not infringed. On information and belief, Samsung also claims it does not infringe the patent-in-suit.

39. Netlist has complied with all RAND obligations regardless of whether its patent is essential.

40. Even if Samsung had a right to a RAND license to Netlist's patents, those rights were eliminated by Samsung's bad faith, including its material breach of the JDLA and its willful infringement of Netlist's patents.

41.    Samsung has been found in material breach of the JDLA, thus eliminating any right Samsung would have had to a RAND license, if one existed.  *See* Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 20-cv-993 (C.D. Cal. May 17, 2024), Dkt. No. 556.

42.    Samsung is an adjudicated willful infringer of a number of Netlist's patents.  *See* Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463 (E.D. Tex. Apr. 21, 2023), Dkt. No. 479.

43.    Therefore, Samsung lost any right to have a RAND license to Netlist's patents, if a right ever existed.

44.    On information and belief, because Samsung maintains the patent-in-suit is not essential to any JEDEC standard, Netlist had no obligation to disclose either patent to JEDEC or its members.  *Cf.* Order on Pretrial Motions, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. Apr. 5, 2023), Dkt. No. 432 (granting Netlist's motion in limine to "[p]reclude Samsung from presenting any allegations that Netlist has failed to comply with JEDEC obligations").

45.    The Court has rejected Samsung's equitable defenses arising from these same facts. *See* Memorandum Opinion and Order, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. Aug. 11, 2023), Dkt. No. 550; *cf.* Final Judgment, *EDTX II*, No. 2:22-cv-00293 (E.D. Tex. Dec. 2, 2024), Dkt. No. 855.

46.    Any coercive claims relating to the above are compulsory and must be brought by Samsung in this action.

## IV.    <u>FIRST CLAIM FOR RELIEF – '407 Patent</u>

47.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

48.    On information and belief, Defendants directly infringed and are currently infringing at least one of the claims of the '407 Patent by, among other things, making, using,

selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused DDR5 Products, and other products with materially the same structure in relevant part.  For example, and as shown below, the Accused DDR5 Products and other products with materially the same structure and operating mechanisms in relevant part infringe at least Claim 1 of the '407 Patent.

49.    The allegations below are based upon Netlist's current information and belief. Internal documentation from Defendants, including confidential Samsung product specifications and source code, will show infringement.  The examples provided below are not intended to be, and should not be understood as, limiting in any way.

50.    Samsung publicly represents that it "manufactures products that abide by JEDEC standards and consistently aims for the best efficiency in the industry,"[6] and that its DDR5 DRAM "[l]everag[es] the latest DDR5 standard."[7]  Samsung also specifically advertises that Accused DDR5 RDIMM products comply with the "JEDEC DDR5 standard."[8]  Therefore, on information and belief, the Accused DDR5 Products comply with JEDEC Standards for Double Data Rate 5 (DDR5) Registered Dual In-line Memory Modules (DDR5 RDIMM), including JESD305 for "DDR5 Load Reduced (LRDIMM) and Registered Dual In-line Memory Module (RDIMM) Common Specification," January 2022 and JESD82-513 (Rev. 1.00) for "DDR5 Registering Clock Driver Definition (DDR5RCD03)," March 2023, and proposed JEDEC Standards for DDR5

---

[6] *Optimized DDR5 DIMM Solutions: Powering Leading-Edge Server Memory Modules*, Samsung (Apr. 9, 2025), https://semiconductor.samsung.com/news-events/tech-blog/optimized-ddr5-dimm-solutions-powering-leading-edge-server-memory-modules/.

[7] *Samsung Electronics Develops Industry's First 12nm-Class DDR5 DRAM*, Samsung: News (Dec. 20, 2022), https://semiconductor.samsung.com/news-events/news/samsung-electronics-develops-industrys-first-12nm-class-ddr5-dram/.

[8] See Samsung M321R8GA0PB0-CWM, Samsung M321R8GA0BB0-CQK, and Samsung M321R4GA3BB6-CQK, *supra* ¶ 27.

Multiplexed Rank Dual In-line Memory Mules (MRDIMM), such as JESD82-542 (Proposal) for "DDR5 MR Registering Clock Driver Definition (DDR5MRCD02)," January 30, 2025.

51.    To the extent the preamble is limiting, the Accused DDR5 Products are memory modules operable in a computer system with a memory controller and a system bus that includes one or more clock signal lines, control/address (C/A) signal lines, and data signal lines.  For example, Samsung confirms on its website that the Accused DDR5 RDIMM (*i.e.*, registered dual in-line memory module) and DDR5 MRDIMM (*i.e.*, multiplexed rank dual in-line memory module) products are memory modules.  *See, e.g., Dram: DDR*, Samsung, https://semiconductor.samsung.com/dram/ddr/ (last visited July 3, 2026) (RDIMM "is a type of server ***memory module***") (emphasis added):

### What is RDIMM?

RDIMM (Registered DIMM) is a type of server memory module that includes a register between the memory controller and the DRAM chips.

This register buffers or "stabilizes" the command and address signals before they reach the DRAM chips, reducing electrical load on the memory controller. Because of this architecture, RDIMMs provide greater reliability and support higher memory capacities compared to unbuffered modules, making them widely used in enterprise servers and data-center systems. RDIMMs are designed specifically for server environments and are not compatible with standard desktop or laptop systems.

*See also id.* (categorizing RDIMM and MRDIMM as "DDR5 Module[s]"):



52.    On information and belief, the accused DDR5 memory modules are operable in a computer system with a memory controller and system bus when the modules are inserted into memory slots on compatible motherboards.  For example, Samsung explains on its website that "a

DRAM module is the completed memory product … that computing systems can actually use." *Dram: DDR*, Samsung, https://semiconductor.samsung.com/dram/ddr/ (last visited July 3, 2026):

**What is the difference between a DRAM chip and a DRAM module?**

A DRAM chip is an individual semiconductor device that stores data temporarily using an array of memory cells. A single DRAM chip cannot be used directly as system memory, so multiple chips are assembled onto a circuit board to create a form that can be installed in a computer or server.

In other words, a DRAM chip is the fundamental building block of memory, while a DRAM module is the completed memory product made by combining these chips into a structure that computing systems can actually use.

53.    Samsung further explains that computer systems are designed to support (i.e., communicate with) certain types of memory, so when DDR5 DIMMs are inserted into a motherboard, "the system will not operate properly unless the CPU also supports DDR5," which is determined by "the ***memory controller inside the CPU***."    *DDR5*, Samsung, https://semiconductor.samsung.com/dram/ddr/ddr5/ (last visited July 3, 2026) (emphasis added):

**How can I check if my motherboard supports DDR5?**

To check whether your motherboard supports DDR5, first look up your motherboard model and review the official specification page on the manufacturer's website. The memory section will clearly indicate which types of RAM—such as DDR5 or DDR4—are supported.

It is also important to check your CPU, because the memory controller inside the CPU determines which DDR generation it can use. Even if the motherboard has DDR5 slots, the system will not operate properly unless the CPU also supports DDR5.

54.    On information and belief, the system bus includes one or more clock signal lines, control/address (C/A) signal lines, and data signal lines.  For example, Samsung's website FAQs and descriptions of Accused DDR5 Products discuss clock, control/address, and data signals being communicated between the system memory controller and the memory module.  *See, e.g.*, *Dram: DDR*, Samsung, https://semiconductor.samsung.com/dram/ddr/ (last visited July 3, 2026) (explaining the "register between the memory controller and the DRAM chips" "buffers or 'stabilizes' the command and address signals before they reach the DRAM chips"):

- 21 -

**What is RDIMM?**

RDIMM (Registered DIMM) is a type of server memory module that includes a register between the memory controller and the DRAM chips.

This register buffers or "stabilizes" the command and address signals before they reach the DRAM chips, reducing electrical load on the memory controller. Because of this architecture, RDIMMs provide greater reliability and support higher memory capacities compared to unbuffered modules, making them widely used in enterprise servers and data-center systems. RDIMMs are designed specifically for server environments and are not compatible with standard desktop or laptop systems.

*See also id.* (explaining that "the memory controller coordinates read and write operations," and DDR (DRAM) memory "send[s] or receive[s] data" "in sync with the clock"):

**What does DDR stand for, and how does it work?**

DDR stands for Double Data Rate.
It is a type of DRAM that sends data twice during one clock cycle.

A "clock" in digital systems is like a repeating beat that tells the memory when to send or receive data.
Each beat has an "up" movement (rising edge) and a "down" movement (falling edge).

Older memory sent data only on one of these edges, but DDR sends data on both.
This means DDR can transfer data twice per cycle without increasing the clock speed itself.

Inside DDR memory, data is stored in DRAM cells made of one transistor and one capacitor,
and the memory controller coordinates read and write operations in sync with the clock.
Because it uses both edges of the clock, DDR provides much higher bandwidth for modern systems.

55.     Further, on information and belief, the Accused DDR5 Products comply with the JEDEC Standard No. 305 "Pin Definitions" table below, which lists the DDR5 RDIMM module board pins with their corresponding signal lines in the system bus.  *See* JESD305, at 3, Tbl. 3:

JEDEC Standard No. 305
Page 3

**3      Connector Pinout and Signal Description**

**Table 3 — Pin Definitions**

| Pin Name | Description | Pin Name | Description |
|---|---|---|---|
| CA[6:0]_A CA[6:0]_B | Address and Command Bus | DQ[31:0]_A DQ[31:0]_B | DIMM memory Data bus channel A & B |
| CS[1:0]_A CS[1:0]_B | Chip Select | CB[7:0]_A CB[7:0]_B | DIMM ECC Checkbits (CB) channel A & B |
| PAR_A PAR_B | Parity input | DQS[9:0]_A_t DQS[9:0]_B_t | Data Strobes (positive line of differential pair) |
| CK_t | Clocks (true/positive) | DQS[9:0]_A_c DQS[9:0]_B_c | Data Strobes (negative line of differential pair) |
| CK_c | Clocks (complement/negative) | TDQS[9:5]_A_t TDQS[9:5]_B_t | Not valid for x4 operation. Enabled via Mode Register. |
| ALERT_n | Alert for CRC error | TDQS[9:5]_A_c TDQS[9:5]_B_c | Not valid for x4 operation. Enabled via Mode Register. |
| RESET_n | Set DRAM to known state | VIN_BULK | DIMM Power Supply from system to PMIC |

*See also id.* at 4, Table 4 (providing functional descriptions of electrical signals in Table 3):

JEDEC Standard No. 305
Page 4

**3    Connector Pinout and Signal Description (cont'd)**

**Table 4 — Input/Output Functional Description**

| Symbol | Type | I/O Levels | Function |
|---|---|---|---|
| CK_t, CK_c, | Input | VDD | Clock: CK_t and CK_c are differential clock inputs. All address and control input signals are sampled on the crossing of the positive edge of CK_t and negative edge of CK_c. |
| CA[6:0]_A CA[6:0]_B | Input | VDD | Command/Address Inputs: CA signals provide the command and address inputs according to the Command Truth Table. Note: Since some commands are multi-cycle, the pins may not be interchanged between devices on the same bus. The address inputs also provide the op-code during Mode Register Set commands. |
| CS[1:0]_A CS[1:0]_B | Input | VDD | Chip Select: All commands are masked when CS_n is registered HIGH. CS_n provides for external Rank selection on systems with multiple Ranks. CS_n is considered part of the command codes. CS_n is also used to enter and exit the parts from power down mode and self-refresh mode. While not in self-refresh mode the CS_n input buffer operates with the same ODT and VREF parameters as configured by the CA_ODT strap setting or mode register. When in self-refresh the CS_n is a CMOS rail to rail signal with DC high and low at 80% and 20% of VDD. |

. . .

| Symbol | Type | I/O Levels | Function |
|---|---|---|---|
| DQ[31:0]_A DQ[31:0]_B | Input/ Output | VDD | Data Input/ Output: Bi-directional data bus. If CRC is enabled via Mode register, then CRC code is added at the end of Data Burst. Any DQ from DQ0-DQ3 may indicate the internal Vref level during test via Mode Register Setting MR4 A4=High. Refer to vendor specific data sheets to determine which DQ is used. |
| CB[7:0]_A CB[7:0]_B | Input/ Output | VDD | ECC Checkbits Input/ Output: Bi-directional data bus - for 8-bit ECC (EC8) all 8 bits are used - for 4-bit ECC (EC4) [3:0] bits are used; [7:4] bits are floating |
| DQS[9:0]_A_t DQS[9:0]_B_t DQS[9:0]_A_c DQS[9:0]_B_c | Input/ Output | VDD | Data Strobe: output with read data, input with write data. Edge-aligned with read data, centered in write data. The Data Strobe DQS_t is paired with differential signals DQS_c, respectively, to provide differential pair signaling to the system during reads and writes. DDR5 SDRAM supports differential Data Strobe only and does not support single-ended. |

56.    On information and belief, each memory module comprises a printed circuit board (PCB) with connectors that are configured to provide electrical connections between the memory module and the system bus.  For example, Samsung shows the Accused DDR5 Products as having green printed circuit boards and gold edge connections.  *See, e.g.*, *Dram: DDR*, Samsung, https://semiconductor.samsung.com/dram/ddr/ (last visited July 3, 2026) (DDR5 RDIMM):



*See also id.* (DDR5 MRDIMM):



57.     According to Samsung, the gold edge connections, or "Gold Fingers[,] are the gold-plated contact points on the edge of a PCB or DIMM, which allow signals and power to pass between the memory and the motherboard." *Optimized DDR5 DIMM Solutions: Powering Leading-Edge Server Memory Modules*, Samsung: Tech Blog (Apr. 9, 2025), https://semiconductor.samsung.com/news-events/tech-blog/optimized-ddr5-dimm-solutions-powering-leading-edge-server-memory-modules/. For example, Table 3 above illustrates that the module board has edge connections for coupling to clock signal lines (CK_t, CK_c), control/address (C/A) signal lines (CA[6:0]_A, CA[6:0]_B, CS[1:0]_A, CS[1:0]_B), and data signal lines (DQ[31:0]_A, DQ[31:0]_B) of the system bus. *See* JESD305 at 3, Tbl. 3.

58.     The accused memory modules further contain memory devices mounted on the PCB and organized in a plurality of groups, wherein a respective group of the memory devices is configurable to communicate data with the memory controller via a corresponding subset of the data signal lines. For example, Samsung describes its memory modules as integrating multiple DRAM chips (*i.e.*, memory devices) onto a circuit board. *See Dram: DDR*, Samsung, https://semiconductor.samsung.com/dram/ddr/ (last visited July 3, 2026):

### What is a DRAM module?

A DRAM module is a memory component that integrates multiple DRAM chips onto a small circuit board and serves as the main memory in computers and electronic devices. These modules are manufactured in standardized formats so they can be easily installed and recognized by different systems. Common examples include UDIMM for desktop PCs, SO-DIMM for laptops and compact systems, and RDIMM or LRDIMM for servers and data-center platforms.

The DRAM module temporarily stores the data required by processors such as the CPU or GPU, enabling smooth program execution, efficient multitasking, and stable data processing. In essence, it is an essential component that directly influences the overall performance and responsiveness of modern computing systems.

*See also* Open Compute Project, *Memory for Every AI Need Samsungs Next gen Memory Solutions to Lead the Future of AI*, YouTube, at 9:16 (Oct. 22, 2025), https://www.youtube.com/watch?v=vZvSesFwK2o:



59.　Further, on information and belief, as shown in the figures above, the memory devices are mounted on the PCB and organized in a plurality of groups (e.g., groups of 5 SDRAMs), which communicate data with the memory controller of the host computer system using data signal lines, *e.g.*, DQ[31:0]_A and DQ[31:0]_B, *see* Table 3 (Pin Definitions), *supra* ¶ 55 (identifying DQ[31:0]_A and DQ[31:0]_B as "DIMM memory Data bus channel A & B"). Additionally, a respective group of the memory devices is configurable to communicate data with the memory controller via a corresponding subset of the data signal lines, *e.g.*, DQ[31:0]_A.

60.　The accused memory modules further contain circuitry mounted on the PCB that is configurable to receive from the memory controller a system clock via the one or more clock signal lines and input control and address (C/A) signals via the C/A signal lines.  For example, the Accused DDR5 RDIMM products have a registering clock driver (RCD) on the module board that can "buffer command and control signals." *Dram: DDR*, Samsung, https://semiconductor.samsung.com/dram/ddr/ (last visited July 3, 2026) (reproduced below).  On information and belief, the MRCD on Samsung's DDR5 MRDIMMs play a similar role.



61.     On information and belief, the Accused DDR5 Products incorporate RCD and MRCD components from third parties such as Rambus, Montage, and Renesas.  For example, Samsung's Accused DDR5 RDIMM offerings on Amazon.com show DDR5 RCD components from Rambus and Montage mounted to the module boards.  *See, e.g.*, Samsung M321R8GA0BB0-CQK, *supra* ¶ 27:



Samsung M321R4GA3BB6-CQK, *supra* ¶ 27:



62.     Additionally, Renesas's press release concerning its latest DDR5 RCD includes a statement from a Samsung representative that indicates Samsung integrates Renesas RCDs into the Accused DDR5 Products.  *See Renesas' Industry-First Gen6 DDR5 Registered Clock Driver Sets Performance Benchmark by Delivering 9600 MT/s*, Renesas (Nov. 12, 2025), https://www.renesas.com/en/about/newsroom/renesas-industry-first-gen6-ddr5-registered-clock-

driver-sets-performance-benchmark-delivering-9600 ("'Samsung has collaborated with Renesas across multiple generations of memory interface components, including the successful qualification of Gen5 DDR5 RCD and PMIC5030,' said Indong Kim, VP of DRAM Product Planning, Samsung Electronics. 'We are now excited to integrate Gen6 RCD into our DDR5 DIMMs, across multiple SoC platforms to support the growing demands of AI, HPC, and other memory-intensive workloads.'").

63.     Product documentation from Rambus, Montage, and Renesas pertaining to their DDR5 RCDs and MRCDs confirms the Accused DDR5 Products contain circuitry configurable to receive a system clock signal and input control/address signals from the memory controller. *See, e.g.*, *RRG5005: Gen 5 DDR5 Registering Clock Driver*, Renesas, https://www.renesas.com/en/products/rrg5005 (last visited July 3, 2026) (explaining the "primary function" of the "registering clock driver (RCD) used on DDR5 RDIMMs" "is to buffer the Command/Address (CA) bus, chip selects, and clock between the host controller and the DRAMs"); *Renesas Introduces Industry's First Complete Memory Interface Chipset Solutions for Second-Generation DDR5 Server MRDIMMs*, Renesas (Nov. 20, 2024), https://www.renesas.com/en/about/newsroom/renesas-introduces-industry-s-first-complete-memory-interface-chipset-solutions-second-generation (Renesas' "MRCD is used on the MRDIMMs to buffer the Command/Address (CA) bus, chip selects and the clocks between the host controller and DRAMs."); *see also DDR5 Registering Clock Driver (DDR5 RCD)*, Rambus, https://www.rambus.com/memory-interface-chips/ddr5-dimm-chipset/ddr5-rcd/ (last visited July 3, 2026):



*See also M88DR5RCD01: Gen1 DDR5 RCD for RDIMM / LRDIMM*, at 2, Montage Tech., https://www.montage-tech.com/sites/default/files/2022-11/M88DR5RCD01_Flyer_English.pdf:



64.     On information and belief, the circuitry in the Accused DDR5 Products is further configurable to generate module C/A signals in response to the input C/A signals and to output the module C/A signals to the memory devices.  For example, Rambus explains that the "DDR5 RCD provides Command/Address (CA) and clocks to the DDR5 memory devices in RDIMMs," and specifically, "[t]he RCD distributes C/A signals and clocks for each subchannel, rank and nibble." *DDR5 Registering Clock Driver (DDR5 RCD)*, Rambus, https://www.rambus.com/memory-interface-chips/ddr5-dimm-chipset/ddr5-rcd/ (last visited July 3, 2026).  This is consistent with Renesas's Server DIMM diagram showing the RCD receiving input C/A signals from the memory controller on Sub-Channels A and B, and in response, generating and outputting C/A signals to

the groups of DRAM devices. *See Memory Interface Products Brochure*, at 4, Renesas,

https://www.renesas.com/en/document/bro/memory-interface-products-brochure?r=417486:



*See also RRG5005: Gen 5 DDR5 Registering Clock Driver*, Renesas,

https://www.renesas.com/en/products/rrg5005 (last visited July 3, 2026) (showing four module

C/A signals generated for output to DRAM devices (QACA[13:0]_A, QBCA[13:0]_A,

QACA[13:0]_B, QBCA[13:0]_B) in response to two input C/A signals from memory controller

(DCA[6:0]_A, DCA[6:0]_B)):



65.    By way of further example, Renesas confirms the MRCD is configurable to

generate module C/A signals in response to input C/A signals and to output those module C/A

signals to the DRAM devices, explaining that the MRCD is used on MRDIMMs "to buffer the

Command/Address (CA) bus, chip selects and clock between the host controller and the DRAMs.

… MRCD demultiplexes the pseudo-channels and transmits each to a separate DRAM output interface. Each DRAM interface is a 14-bit single data rate CA bus output with a chip-select. MRCD also transcodes commands from the CA bus onto a per-channel BCOM bus for data buffer control."  Sung Kim, *Renesas Continues Leadership in Data Center with New Chipsets for High Performance Memory Modules Based on DDR5 Multiplexer Combined Ranks (MCR) Dual In-line Memory Module*, Renesas (Dec. 9, 2022), https://www.renesas.com/en/blogs/renesas-continues-leadership-data-center-new-chipsets-high-performance-memory-modules-based-ddr5.

66.     On information and belief, the mounted circuitry (*i.e.*, the RCD or MRCD) is further configurable to generate a plurality of local clocks corresponding, respectively, to the plurality of groups of the memory devices, the plurality of local clocks having respective phase relationships with the system clock, the respective phase relationships being programmable independently of each other.  By way of example, Renesas explains the DDR5 RCD "[p]rovides access to internal control words for configuring device features and adapting to different RDIMM system applications."     *RRG5005: Gen 5 DDR5 Registering Clock Driver*, Renesas, https://www.renesas.com/en/products/rrg5005 (last visited July 3, 2026).  The list of control words to delay output timing are provided in JEDEC standards documents, *see* JESD82-513, at 150-52 (DDR5 RCD); *see also* proposed JESD82-542, at 244-45 (DDR5 MCRD).  For example:

**8.13.2  RW12 - QACK Output Delay Control Word**

Table 119 —  RW12: QACK Output Delay Control Word

| OP 7 | OP 6 | OP 5 | OP 4 | OP 3 | OP 2 | OP 1 | OP 0 | Definition | Encoding |
|---|---|---|---|---|---|---|---|---|---|
| x | x | 0 | 0 | 0 | 0 | 0 | 0 | Output Delay Control for QACK_t/ | Delay Outputs by +(0/64) * $t_{CK}$ (Same as Default) |
| x | x | 0 | 0 | 0 | 0 | 0 | 1 | QACK_c Output Signals[1,2] | Delay Outputs by +(1/64) * $t_{CK}$ |
| x | x | 0 | 0 | 0 | 0 | 1 | 0 | | Delay Outputs by +(2/64)* $t_{CK}$ |
| x | x | | | ... | | | | | ... |
| x | x | 1 | 1 | 1 | 1 | 0 | 1 | | Delay Outputs by +(61/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 0 | | Delay Outputs by +(62/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 1 | | Delay Outputs by +(63/64) * $t_{CK}$ |
| x | 0 | x | x | x | x | x | x | Reserved | Reserved |
| x | 1 | x | x | x | x | x | x | | Reserved |
| 0 | x | x | x | x | x | x | x | Output Delay Feature Enable for | (Default) Feature Disabled |
| 1 | x | x | x | x | x | x | x | QACK_t/QACK_c[2] | Feature Enabled[3] |

NOTE 1    These control bits do not have any effect unless RW12[7] = 1.
NOTE 2    RW12[7:0] will be sticky, cleared by power cycle not Reset.
NOTE 3    When feature is enabled the delay settings in RW12[5:0] require a time of $t_{ODU}$ for the delay to become stable on the outputs.

#### 8.13.3  RW13 - QBCK Output Delay Control Word

**Table 120 — RW13: QBCK Output Delay Control Word**

| OP 7 | OP 6 | OP 5 | OP 4 | OP 3 | OP 2 | OP 1 | OP 0 | Definition | Encoding |
|---|---|---|---|---|---|---|---|---|---|
| x | x | 0 | 0 | 0 | 0 | 0 | 0 | Output Delay Control for QBCK_t/ QBCK_c Output Signals[1,2] | Delay Outputs by +(0/64) * $t_{CK}$ (Same as Default) |
| x | x | 0 | 0 | 0 | 0 | 0 | 1 | | Delay Outputs by +(1/64 )* $t_{CK}$ |
| x | x | 0 | 0 | 0 | 0 | 1 | 0 | | Delay Outputs by +(2/64) * $t_{CK}$ |
| x | x | | | ... | | | | | ... |
| x | x | 1 | 1 | 1 | 1 | 0 | 1 | | Delay Outputs by +(61/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 0 | | Delay Outputs by +(62/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 1 | | Delay Outputs by +(63/64) * $t_{CK}$ |
| x | 0 | x | x | x | x | x | x | Reserved | Reserved |
| x | 1 | x | x | x | x | x | x | | Reserved |
| 0 | x | x | x | x | x | x | x | Output Delay Feature Enable for QBCK_t/QBCK_c[2] | (Default) Feature Disabled |
| 1 | x | x | x | x | x | x | x | | Feature Enabled[3] |

NOTE 1  These control bits do not have any effect unless RW13[7] = 1.
NOTE 2  RW13[7:0] will be sticky, cleared by power cycle not Reset.
NOTE 3  When feature is enabled the delay settings in RW13[5:0] require a time of $t_{ODU}$ for the delay to become stable on the outputs.

#### 8.13.4  RW14 - QCCK Output Delay Control Word

**Table 121 — RW14: QCCK Output Delay Control Word**

| OP 7 | OP 6 | OP 5 | OP 4 | OP 3 | OP 2 | OP 1 | OP 0 | Definition | Encoding |
|---|---|---|---|---|---|---|---|---|---|
| x | x | 0 | 0 | 0 | 0 | 0 | 0 | Output Delay Control for QCCK_t/ QCCK_c Output Signals[1,2] | Delay Outputs by +(0/64) * $t_{CK}$ (Same as Default) |
| x | x | 0 | 0 | 0 | 0 | 0 | 1 | | Delay Outputs by +(1/64 )* $t_{CK}$ |
| x | x | 0 | 0 | 0 | 0 | 1 | 0 | | Delay Outputs by +(2/64) * $t_{CK}$ |
| x | x | | | ... | | | | | ... |
| x | x | 1 | 1 | 1 | 1 | 0 | 1 | | Delay Outputs by +(61/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 0 | | Delay Outputs by +(62/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 1 | | Delay Outputs by +(63/64) * $t_{CK}$ |
| x | 0 | x | x | x | x | x | x | Reserved | Reserved |
| x | 1 | x | x | x | x | x | x | | Reserved |
| 0 | x | x | x | x | x | x | x | Output Delay Feature Enable for QCCK_t/QCCK_c[2] | (Default) Feature Disabled |
| 1 | x | x | x | x | x | x | x | | Feature Enabled[3] |

NOTE 1  These control bits do not have any effect unless RW14[7] = 1.
NOTE 2  RW14[7:0] will be sticky, cleared by power cycle not Reset.
NOTE 3  When feature is enabled the delay settings in RW14[5:0] require a time of $t_{ODU}$ for the delay to become stable on the outputs.

#### 8.13.5  RW15 - QDCK Output Delay Control Word

**Table 122 — RW15: QDCK Output Delay Control Word**

| OP 7 | OP 6 | OP 5 | OP 4 | OP 3 | OP 2 | OP 1 | OP 0 | Definition | Encoding |
|---|---|---|---|---|---|---|---|---|---|
| x | x | 0 | 0 | 0 | 0 | 0 | 0 | Output Delay Control for QDCK_t/ QDCK_c Output Signals[1,2] | Delay Outputs by +(0/64) * $t_{CK}$ (Same as Default) |
| x | x | 0 | 0 | 0 | 0 | 0 | 1 | | Delay Outputs by +(1/64)* $t_{CK}$ |
| x | x | 0 | 0 | 0 | 0 | 1 | 0 | | Delay Outputs by +(2/64) * $t_{CK}$ |
| x | x | | | ... | | | | | ... |
| x | x | 1 | 1 | 1 | 1 | 0 | 1 | | Delay Outputs by +(61/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 0 | | Delay Outputs by +(62/64) * $t_{CK}$ |
| x | x | 1 | 1 | 1 | 1 | 1 | 1 | | Delay Outputs by +(63/64) * $t_{CK}$ |
| x | 0 | x | x | x | x | x | x | Reserved | Reserved |
| x | 1 | x | x | x | x | x | x | | Reserved |
| 0 | x | x | x | x | x | x | x | Output Delay Feature Enable for QDCK_t/QDCK_c[2] | (Default) Feature Disabled |
| 1 | x | x | x | x | x | x | x | | Feature Enabled[3] |

NOTE 1  These control bits do not have any effect unless RW15[7] = 1.
NOTE 2  RW15[7:0] will be sticky, cleared by power cycle not Reset.
NOTE 3  When feature is enabled the delay settings in RW15[5:0] require a time of $t_{ODU}$ for the delay to become stable on the outputs.

67.     Further, in DDR5 RCDs and DDR5 MRCDs, such as those in the Accused DDR5 Products, "control words are independent between the two channels. Each channel has a separate control word space that is accessible via the input chip selects for that channel. … Control word writes may occur independently on the two channels, so it is possible that both channels will be processing control word accesses at the same time, possibly offset by any number of DCKs from each other."  JESD82-513, at 125; proposed JESD82-542, at 213.

68.     On information and belief, the circuitry (*i.e.*, the RCD or MRCD) in the Accused DDR5 Products is further configurable to output the plurality of local clocks to the memory

devices, wherein a respective local clock having a respective programmable phase relationship with the system clock is output to one group of memory devices and not to any other group of memory devices.  For example, Renesas explains that its DDR5 RCD "has a common clock input and PLL, but produces four separate clock pairs to the DRAM channels."  *RRG5005: Gen 5 DDR5 Registering Clock Driver*, Renesas, https://www.renesas.com/en/products/rrg5005 (last visited July 3, 2026).  And Montage describes the RCD in Accused DDR5 Products as capable of "distributing one differential clock pair to five differential pairs per channel."  *M88DR5RCD01 (Gen1   DDR5   RCD)*,   Montage   Tech.,   https://www.montage-tech.com/Memory_Interface/DDR5/M88DR5RCD01 (last visited July 3, 2026).

69.     On further information and belief, the group of memory devices to which the local clock is outputted can be configured to perform memory read or write operations by communicating data signals with the memory controller via a corresponding subset of data signal lines in accordance with the respective local clock.  For example, as shown below, a corresponding group of memory devices, *e.g.*, memory devices D01, D02, D03, D04 and D05, communicates via a corresponding subset of data signal lines of the memory module that includes DQ[3:0], DQ[11:08], DQ[19:16], DQ[27:24], and CB[3:0].  *See* JESD305, at 5, Fig. 3:



Figure 3 — X72 DIMM, Populated as Two Package Ranks of x4 DDR5 SDRAMs (Part 2 of 4)

70.    On further information and belief, in the Accused DDR5 Products, the data pins of the memory devices of each group of the plurality of groups are mapped to a corresponding subset of data signal lines, and because each group receives a respective local clock, all memory read or write operations performed by each group of memory devices are therefore in accordance with the respective local clock.  For example, JESD79-5C_v1.30 contains a timing diagram for performing read operations, which illustrates the timing relationship of the data output in response to a read operation in accordance with the respective local clock signal "CK" which is received by the memory device performing the read operation.  *See* JESD79-5C_v1.30, at 135, Fig. 35:

JEDEC Standard No. 79-5C_v1.30
Page 135

### 4.7 Read Operation

The Read Operation causes the DRAM to retrieve and output data stored in its array. The Read Operation is initiated by the Read Command during which the beginning column address and bank/group address for the data to be retrieved from the array is provided. The data is driven by the DRAM on its DQ pins RL (CL) cycles after the Read Command along with the proper waveform on the DQS inputs. Read Latency (RL or CL) is defined from the Read command to data and is not affected by the Read DQS offset timing (MR40 OP[2:0]).

### 4.7.1 READ Burst Operation

During a READ or WRITE command, DDR5 shall support BC8, BL16, BL32 (optional) and BL32 OTF (optional) during the READ or WRITE. MR0[1:0] is used to select burst operation mode.



NOTES:
1. BL=16, Preamble = 2tCK - 0010 Pattern Preamble, 1.5tCK Postamble
2. DES commands are shown for ease of illustration; other commands may be valid at these times.
3. In this example, Read DQS Offset Timing is set to 0 Clocks.

**Figure 35 — READ Burst Operation (BL16)**

71.     Similarly, the diagram below for write operations illustrates a similar timing relationship for write operations performed in accordance with the respective local clock "CK" that must be received by the memory device performing the write memory operation. *See* JESD79-5C_v1.30, at 147, Fig. 49:

- 34 -

JEDEC Standard No. 79-5C_v1.30
Page 147

#### 4.8.2   Write Burst Operation

The following write timing diagrams are to help understand the meaning of each write parameter; the diagrams are just examples. The details of each parameter are defined separately.

In these write timing diagrams, for clarity of illustration, CK and DQS are shown aligned. As well, DQS and DQ are shown center-aligned. Offset between CK and DQS, and between DQS and DQ may be appropriate.



NOTES:
1. BL=16, 2tCK Preamble, 1.5tCK Postamble
2. DES commands are shown for ease of illustration; other commands may be valid at these times.
3. The DQ signal is shown as "Don't Care" before the first Write data bit indicating DFE is disabled. When DFE is enabled, the DQ signal shall be high for a minimum of 4UI prior to the first Write data bit for proper DFE synchronization.

**Figure 49 — WRITE Burst Operation (BL16)**

72.     On information and belief, Defendants also indirectly infringe the '407 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as customers and end users, in the Eastern District of Texas and elsewhere in the United States.  For example, on information and belief, Defendants have induced, and currently induce, the infringement of the '407 Patent through their affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused DDR5 Products and other materially similar products that infringe the '407 Patent.

73.     On information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the Accused DDR5 Products and other materially similar products by users in a manner that Defendants know or should have known would result in infringement and with the intent of inducing infringement.  For example, Samsung instructs its customers on how to use the Accused

DDR5 Products, despite knowing that such use by its customers constitutes infringement.  *See, e.g.*, SamsungSemiUS, *Samsung Memory in the Age of Data*, YouTube, at 1:08 (Sept. 9, 2020), https://www.youtube.com/watch?v=NDi-UQFsPcQ (consumer-oriented marketing video demonstrating use of Accused DDR5 Products as "Server DRAM" "memory solution[]" and showing Accused DDR5 RDIMMs being inserted into memory slots on motherboard):



*See also* Open Compute Project, *Memory for Every AI Need Samsungs Next gen Memory Solutions to Lead the Future of AI*, YouTube, at 8:27 (Oct. 22, 2025), https://www.youtube.com/watch?v=vZvSesFwK2o:



*Id.* at 9:16:



*See also Innovative Memory Solution: Samsung's MCRDIMM Targets High-Performance Computing*, Samsung: Tech Blog (June 16, 2024), https://semiconductor.samsung.com/news-events/tech-blog/innovative-memory-solution-samsungs-mcrdimm-targets-high-performance-computing/:

> MCRDIMM enables CPU to access two ranks of memory simultaneously on a single DIMM with a chip-set layout of two identical DDR5 DIMMS. The benefit of this approach is that the DRAM devices are not expected to operate at a faster clock frequency. By accessing two DRAM devices at the same time, the CPU can effectively double the memory bandwidth coming from the DIMM. Accessing the two DRAM devices is accomplished by using a special mux data buffer resident on the DRAM, which allows for simultaneous access to both DIMMs thereby doubling the data rate to the host.

74.     Samsung additionally provides customers with specific examples of computer systems that are compatible with the Accused DDR5 Products alongside the infringing product offerings.  *See, e.g.*, Samsung M321R8GA0BB0-CQK, *supra* ¶ 27:



*See also* Samsung M321R4GA3BB6-CQK, *supra* ¶ 27:



75.    Furthermore, in marketing materials for Samsung's DDR5 DRAM chips, Samsung credits its "close cooperation with customers," such as "operators of data centers and other users of high-performance computing," and its insight into customers' specific use cases and operational needs as having a significant role in the new design and functioning of Samsung's memory technologies. *DDR5: Twice as fast, with a 13% energy saving – and ready to power supercomputing and AI*, Samsung: Tech Blog (Apr. 15, 2021), https://semiconductor.samsung.com/news-events/tech-blog/ddr5-twice-as-fast-with-a-13-energy-saving-and-ready-to-power-supercomputing-and-ai/.

76.     On information and belief, Defendants are encouraging and facilitating infringement of the '407 Patent by others.  For example, on information and belief, Defendants sell or otherwise provide the Accused DDR5 Products to distributors or U.S.-based sales entities knowing that these entities intend to make, use, offer to sell, and/or sell the products within the United States and/or import the products into the United States in an infringing manner.

77.     On information and belief, Defendants also indirectly infringe the '407 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in the Eastern District of Texas and elsewhere in the United States.  For example, on information and belief, Defendants have contributed to, and currently contribute to, Defendants' customers' and end-users' infringement of the '407 Patent through their affirmative acts of selling and offering to sell, either directly or through distributors, in this District and elsewhere in the United States, the Accused DDR5 Products and other materially similar products that infringe the '407 Patent.  On information and belief, the Accused DDR5 Products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Defendants are aware that the product or process that includes the Accused DDR5 Products and other materially similar products may be covered by one or more claims of the '407 Patent.  On information and belief, the use of the product or process that includes the Accused DDR5 Products and other materially similar products infringes at least one claim of the '407 Patent.

78.     Samsung's infringement of the '407 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '407 Patent and its infringement since at least the filing of this Complaint but as early as the '407 Patent issuing.  Samsung's infringement of the '407 Patent has been continuing and willful.  Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew

or should have known that its actions constituted an unjustifiably high risk of infringement.  On information and belief, Samsung was previously aware of the '407 Patent even before its issue date.  Indeed, Samsung has previously admitted to actively monitoring Netlist's applications for patents on DDR5 technologies prior to their issuance.  *See, e.g.*, *Samsung Elecs. Co., Ltd. v. Netlist, Inc.*, C.A. No. 23-1122 (D. Del. July 11, 2025), Dkt. No. 30 at 5 & n.2 ("Samsung intends to file … a claim for declaratory judgment of non-infringement of any patent that issues from [Netlist's] '017 application in this Court").  And Samsung has been aware of the '407 Patent family since at least November 2015, when Netlist provided Samsung with a list of patents, including U.S. Patent Application Nos. PCT/US2014/048517 and 14/445,035).

79.    Avnet's infringement of the '407 Patent has damaged and will continue to damage Netlist.  Avnet has had actual notice of the '407 Patent since at least the filing of this Complaint.  Avnet's infringement of the '407 Patent is willful.  Avnet continues to commit acts of infringement, including advertising, marketing, offering to sell and/or selling the Accused Instrumentalities, despite a high likelihood that its actions constitute infringement, and Avnet knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## V.    SECOND CLAIM FOR RELIEF – Declaratory Judgment of No Breach of RAND Obligations

80.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

81.    Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has breached its commitment under JEDEC.

82.    Any allegation that Netlist has breached any RAND obligation under JEDEC's Patent Policy for the '407 Patent is barred by the statute of limitations.

83.    Netlist cannot have breached its RAND obligations given that (1) Netlist granted Samsung a license in the form of the JDLA, (2) Samsung has never argued this license was not RAND compliant, and (3) the reason why this license is no longer in effect is because of Samsung's own material breach as determined by the Central District of California.  Netlist discharged its RAND obligation by offering a patent license to Samsung that Samsung, not Netlist, chose to breach.

84.    Netlist has also not breached any RAND obligation under JEDEC's Patent Policy, which only applies to "Essential Patent Claims."  JEDEC Manual No. 21T § 8.2.4 ("… each Committee Member … agrees to offer to license on RAND terms … such Committee Member's Essential Patent Claims …"); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard").

85.    The Court has recognized Netlist's patents as not standard essential. *Netlist, Inc. v. Samsung Elecs. Co.,* No. 2:21-cv-463 (E.D. Tex.), Dkt. 427 (PTC Tr.) at 146:15-22 (The Court: "[N]one of the asserted patents are standard essential, they are not encumbered with a RAND obligation"), 147:1-6 (The Court: "[T]here are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-293 (E.D. Tex.); Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that [U.S. Patent Nos. 7,619,912, 11,093,417, and 10,268,608] … are not standard essential patents …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *Netlist, Inc. v. Samsung*

*Elecs. Co.*, No. 2:21-cv-463 (E.D. Tex.), Dkt. 550, at 25.  Similarly, the '407 Patent is not essential to any JEDEC standard.

86.    Netlist has negotiated and offered a license in compliance with RAND.

87.    Samsung is not a willing licensee; rather Samsung has acted in bad faith, including materially breaching the JDLA, and willfully infringing Netlist's patents, thus eliminating any right Samsung would have had to a RAND license, if one existed.

88.    Because RAND obligations do not apply to the '407 Patent, Netlist is not in breach of any RAND obligations.

89.    To the extent RAND obligations do exist, Netlist has complied with all RAND obligations.

90.    Any such claim is barred by the statute of limitations.

91.    Accordingly, Netlist is entitled to a declaration that it has not breached any RAND obligations.

92.    Samsung cannot satisfy any of the elements for such a claim.

## VI.    THIRD CLAIM FOR RELIEF – Declaratory Judgment of No Unlawful Scheme to Acquire and Exploit Monopoly Power in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

93.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

94.    Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has engaged in an unlawful scheme to acquire and exploit monopoly power in violation of Section 2 of the Sherman Act.

95.    Netlist denies that any anti-trust markets exist for anti-trust purposes as it relates to Netlist's actions ("Relevant Markets").

96.     To the extent any Relevant Markets exist, Netlist has no market power in any Relevant Markets.  Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard.  Indeed, Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential.  *EDTX I*, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id*., at 147:1-6 (The Court: "[T]here are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard.  *EDTX I*, Dkt. 550, at 25.  Nor are the claims of the '407 Patent essential to any JEDEC standard.  Thus, Netlist could not have excluded competition much less held power to charge supra-competitive prices.  As a result, Netlist has not acquired or maintained any monopoly power as a result of Netlist's involvement in JEDEC.

97.     Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents as essential or potentially essential to JEDEC committees.  There is no obligation to disclose a patent that is not standard essential.  *See* JEDEC Manual No. 21T § 8.2.4 ("… each Committee Member … agrees to offer to license on RAND terms … such Committee Member's Essential Patent Claims …"); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard").  This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents.

98.     Netlist did not deceive JEDEC or the industry by withdrawing or later rejoining JEDEC committees.

99.     Netlist has no leverage over manufacturers of standard-compliant products.

100.    Because a patent claim must be supported by the specification, Netlist did not use its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry.  The USPTO issued Netlist patents because the concepts it created were novel, non-obvious and properly disclosed.  Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

101.    Netlist's lawful activities have not caused customers in any alleged Relevant Markets, such as Samsung, or customers in the downstream market to face higher costs for access to DDR5 or related technologies.  Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

102.    Any such claim is barred by the statute of limitations.

103.    Samsung has no anti-trust standing and has not suffered anti-trust injury.

104.    Accordingly, Netlist is entitled to a declaration that it has not violated the anti-trust laws.

105.    Samsung cannot satisfy any of the elements for such a claim.

## VII.    FOURTH CLAIM FOR RELIEF – Declaratory Judgment of No Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

106.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

107.    Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy

between Netlist and Samsung as to whether Netlist has engaged in attempted monopolization in violation of Section 2 of the Sherman Act.

108.    Netlist denies that any Relevant Markets exist for anti-trust purposes.

109.    To the extent any Relevant Markets exist, Netlist has not attempted to acquire or exploit market power in any Relevant Markets related to JEDEC-compliant DIMMs.  Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard.  Indeed, Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential.  *EDTX I*, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id.*, at 147:1-6 (The Court: "[T]here are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."").  As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard.  *EDTX I,* Dkt. 550, at 25.  Nor are the claims of the '407 Patent essential to any JEDEC standard.  Thus, Netlist could not have created a probability of excluding competition much less held power to charge supra-competitive prices.  As a result, Netlist has not attempted to acquire or maintain any monopoly power as a result of Netlist's involvement in JEDEC.

110.    Netlist's conduct at JEDEC has not created any probability of achieving monopoly power.  Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents as essential or potentially essential to JEDEC committees.  There is no obligation to disclose a patent that is not standard essential.  *See* JEDEC Manual No. 21T § 8.2.4 ("… each Committee Member … agrees to offer to license on RAND terms … such Committee Member's Essential Patent Claims …"); *id.* at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use

- 45 -

of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard"). This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents. Thus, Netlist has not attempted to acquire monopoly power through improper, exploitative means.

111. Netlist has not attempted to exploit any market power by using its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry because patent claims are limited by the specification. The USPTO issued Netlist patents because the concepts it created were novel, not obvious, and properly disclosed. Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

112. Netlist's lawful activities have not caused customers in any alleged Relevant Markets, such as Samsung, or customers in the downstream market to face a dangerous probability of a distorted market, such as higher costs for access to DIMM technologies. Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

113. Samsung has no anti-trust standing and has not suffered anti-trust injury.

114. Any such claim is barred by the statute of limitations.

115. Accordingly, Netlist is entitled to a declaration that it has not attempted to monopolize the market for technologies covered by any JEDEC standard.

116. Samsung cannot satisfy any of the elements for such a claim.

**VIII.   FIFTH CLAIM FOR RELIEF – Declaratory Judgment of No Unfair Competition Under Cal. Bus. & Prof. Code § 17200**

117.   Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

118.   Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has violated California's UCL.

119.   Netlist has not engaged in any unfair competition under Cal. Bus. & Prof. Code § 17200, including (a) any unlawful business acts or practices in violation of Section 2 of the Sherman Act, (b) any unfair conduct by failing to disclose patents to JEDEC Committees or satisfying its RAND obligations, (c) obtaining its patents through improper derivation—claiming as its own the work of other JEDEC members, (d) knowingly asserting invalid patents in litigation against Samsung, or (e) seeking injunctive relief against Samsung for Samsung's infringement of Netlist's Patents.

120.   Any such claim is barred by the statute of limitations.

121.   Accordingly, Netlist is entitled to a declaration that it is not in violation of California Business & Professions Code § 17200.

122.   Samsung cannot satisfy any of the elements for such a claim.

**IX.   DEMAND FOR JURY TRIAL**

123.   Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

**X.   PRAYER FOR RELIEF**

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.   that Defendants infringe the '407 Patent;

B. all equitable relief the Court deems just and proper as a result of Defendants' infringement;

C. an award of damages resulting from Defendants' acts of infringement in accordance with 35 U.S.C. § 284;

D. that Samsung's infringement of the '407 Patent is willful;

E. that Avnet's infringement of the '407 Patent is willful;

F. a declaration that Netlist is not liable for breach of contract under JEDEC Patent Policy by demanding unreasonable and discriminatory royalties for a license to standard-essential patents;

G. a declaration that Netlist has not violated Section 2 of the Sherman Act, 15 U.S.C. § 2 by engaging in an unlawful scheme to acquire or exploit monopoly power;

H. a declaration that Netlist's '407 Patent is not unenforceable because Netlist has not engaged in a scheme to acquire or exploit monopoly power through enforcement of the patent;

I. a declaration that Netlist has not violated Section 2 of the Sherman Act, 15 U.S.C. § 2 by engaging in attempted monopolization;

J. a declaration that Netlist has not violated California Business and Professions § 17200 based on fraudulent, unlawful, and/or unfair conduct;

K. enhanced damages pursuant to 35 U.S.C. § 284;

L. that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

M. an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest;

N.      in the alternative to an award of damages under 35 U.S.C. § 284, an order pursuant to 35 U.S.C. § 283 permanently enjoining Defendants, their distributors, officers, agents, servants, employees, attorneys, instrumentalities and those persons in privity, active concert or participation with them, from further acts of direct and/or indirect infringement of the '407 Patent, including the manufacture, sale, offer for sale, importation and/or use of the infringing products; and

O.      such other equitable relief which may be requested and to which Netlist is entitled.

Dated: July 6, 2026                              Respectfully submitted,

                                                 */s/ Jennifer Truelove*
                                                 Jason G. Sheasby
                                                 jsheasby@irell.com
                                                 H. Annita Zhong
                                                 azhong@irell.com
                                                 Andrew J. Strabone
                                                 astrabone@irell.com
                                                 Blair A. Silver
                                                 bsilver@irell.com
                                                 Andrew H. Henderson
                                                 dhenderson@irell.com
                                                 **IRELL & MANELLA LLP**
                                                 1800 Avenue of the Stars, Suite 900
                                                 Los Angeles, CA 90067
                                                 Tel. (310) 277-1010
                                                 Fax (310) 203-7199

                                                 Jennifer L. Truelove
                                                 Texas State Bar No. 24012906
                                                 jtruelove@mckoolsmith.com
                                                 **MCKOOL SMITH, P.C.**
                                                 104 East Houston Street Suite 300
                                                 Marshall, TX 75670
                                                 Telephone: (903) 923-9000
                                                 Facsimile: (903) 923-9099

                                                 **Attorneys for Plaintiff Netlist, Inc.**